
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| CHARTER PRIVATE BANK, f/k/a CHARTER BANK, a Washington state-chartered bank, | No. 70208-4-I |
| Respondent, | DIVISION ONE |
| v. | |
| JOSEPH J. SACOTTE, individually and the marital community of JOSEPH J. SACOTTE and MIDORI SACOTTE; JOEL J. LAVIN, individually and the marital community of JOEL J. LAVIN and JANE DOE LAVIN, a Washington limited liability company, | UNPUBLISHED<br><br>FILED: June 16, 2014 |
| Appellants. | |

Cox, J. — A court may approve a settlement agreement if it is "fair and equitable."[1] The proponent of the compromise has the burden of persuading the court that it is fair and equitable.[2] We review for abuse of discretion a trial court's decision that a settlement agreement meets these criteria.[3]

Here, the receiver for First Church LLC, the borrower on a substantial commercial loan from Charter Bank, moved for approval of a settlement of claims

---

[1] In re A & C Props., 784 F.2d 1377, 1381 (9th Cir. 1986).

[2] Id.

[3] See id. at 1380; Werlinger v. Warner, 126 Wn. App. 342, 349, 109 P.3d 22 (2005); Ferree v. Fleetham, 7 Wn. App. 767, 773, 502 P.2d 490 (1972).

between these parties and other relief. The trial court considered the arguments of the parties and evidence in the record and approved the settlement. The court properly exercised its discretion in doing so. We affirm.

Joseph and Midori Sacotte (collectively the Sacottes) are guarantors of a commercial construction loan for the face amount of $9,320,000 from Charter Bank, which later became Charter Private Bank, to First Church LLC. The loan was secured by a deed of trust to certain real property on which 12 luxury townhouses were constructed. The project ran into trouble and was not finished when the note became due. At that point, the bank, the borrower, and the guarantors entered into a Loan Workout and Forbearance Agreement dated April 2010.

Among other things, the bank agreed to "forbear from commencing collection actions on the Loan, or against the Guarantors, for a period of fourteen (14) months from and after the effective date of this Agreement (the 'Forbearance Period'), in order to permit First Church to complete construction of the Project and to sell the townhouse units therein."[4]

As a material inducement to enter the agreement, the parties agreed to "irrevocably and unconditionally forever release" all claims against the other party as of the date of the final signature affixed to the Loan Workout Agreement.[5]

The parties also agreed to designate a third-party private receiver "to oversee disbursement of funds needed to complete construction of the Project

---

[4] Clerk's Papers at 409.

[5] Id. at 415-16.

2

and to sell the units in the Project."[6] The agreement named Tim Patrick from Real Estate Recovery Services LLC as the private receiver.

According to section 8.3 of the Loan Workout Agreement, the private receiver "shall promptly receive an advance retainer in the amount of $10,000 from funds withdrawn from the Pledged Accounts."[7] These accounts were two securities accounts maintained at another bank, one in the names of Joseph Sacotte and Midori Sacotte and the other in the name of another party to the Loan Workout Agreement. These were originally pledged as additional collateral for the loan by the bank.

Section 8.4 stated, "Compensation of the Private Receiver and his accounting professionals, if any, shall be paid by the Bank by the withdrawal of funds from the Pledged Accounts . . . ."[8] The private receiver and Joseph Sacotte also signed a letter of engagement in which the private receiver stated, "I have requested and you [Sacotte] have agreed to provide a retainer of $10,000."[9]

The first draw request after the private receiver's appointment had a line item for the $10,000 retainer, which was signed by Joseph Sacotte and the private receiver. The bank honored the draw request and the funds were placed in First Church's account. First Church did not pay the private receiver's retainer.

---

[6] Id. at 413.

[7] Id. at 415.

[8] Id.

[9] Id. at 555.

3

On July 7, 2010, the private receiver resigned. By letter, the private receiver stated:

> Pursuant to the terms of engagement between First Church LLC and Real Estate Recovery Services, LLC, dated April 21, 2010, Real Estate Recovery Services, LLC hereby exercises its right to resign as Private Receiver effective immediately. Real Estate Recovery Services, LLC is owed for services provided including administrative costs, which will be billed under separate cover.[10]

After the resignation, the bank notified First Church that it was terminating the Loan Workout Agreement pursuant to Sections 7.1.2. and 7.1.3. Under Section 7.1.2, the agreement would immediately terminate if First Church defaulted in its performance of the obligations set out in the agreement. Under Section 7.1.3, the bank's forbearance against pursuing a collection action would be terminated if the private receiver resigned by reason of the failure of First Church to perform its obligations.

Thereafter, the bank commenced this action against First Church and the guarantors, the Sacottes and another person, for breach of promissory note, breach of commercial guaranty agreements, and for appointment of a receiver.

Approximately two months later, the trial court granted the bank's motion to appoint a receiver, and the court named Resource Transition Consultants LLC as the receiver. The order gave the receiver broad powers.

First Church and the Sacottes answered the complaint and asserted a number of affirmative defenses and counterclaims.

---

[10] Id. at 582.

In July 2011, the court-appointed receiver moved for an order authorizing the settlement and compromise of all claims between First Church and the bank in exchange for the bank paying $10,000 to cover the receiver's costs. After reviewing the motion, response, and reply and hearing oral argument, the trial court determined that the Settlement Agreement was "fair and reasonable."

The Sacottes moved for reconsideration, which the trial court denied. The court dismissed the claims against the guarantors for breach of their guaranties. The court also dismissed First Church's two counterclaims for breach of the duty of good faith and fair dealing and for wrongful termination of the Loan Workout Agreement.

The Sacottes appeal. Neither the receiver nor First Church is a party to this appeal.

## SETTLEMENT AGREEMENT

The Sacottes argue that there is an insufficient factual foundation to establish that the Settlement Agreement was fair and equitable. We disagree.

RCW 7.60.060 provides the general powers and duties of a receiver. There are no reported decisions in Washington that interpret the power of a state court receiver under either RCW 7.60.060 or related statutes to settle claims of a debtor. Consequently, the parties agree that we should look to case authority under the Bankruptcy Code for guidance. We do so here.

Before a court approves a settlement agreement, it must determine that the compromise is "fair and equitable."[11] To make this determination, a court may consider four factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.[12]

The proponent of the compromise has the burden of persuading the court that it is fair and equitable.[13] This court reviews a trial court's approval of a settlement agreement for abuse of discretion.[14]

The Ninth Circuit explained in In re A & C Properties that the "purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims."[15] Thus, the law favors compromise over litigation.[16] "[A]s long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed."[17] A

---

[11] In re A & C Props., 784 F.2d at 1381.

[12] Id.

[13] Id.

[14] Id. at 1380; see also Werlinger, 126 Wn. App. at 349; Ferree, 7 Wn. App. at 773.

[15] 784 F.2d 1377, 1380-81 (9th Cir. 1986).

[16] Id. at 1381.

[17] Id.

bankruptcy court is given "great latitude in approving comprise agreements."[18]

Here, the receiver of First Church negotiated the Settlement Agreement with the bank. As the proponent of the agreement, the receiver bore the burden of persuading the court that the agreement was fair and equitable.

In its motion seeking approval of the agreement, the receiver explained that First Church would accept $10,000 from the bank for a full release of all claims against the bank, and the bank would release all of its claims against First Church. The $10,000 covered the costs of the receiver.

The claims released by the parties in the Settlement Agreement specifically included three claims. The bank released one claim. The receiver and the Sacottes contend that First Church released two claims.

The bank released its claim that First Church wrongfully diverted loan proceeds to projects other than the townhouses in the amount of $938,185. On the record then before the trial court, the bank stated that this claim had merit. The receiver agreed. But there remained a genuine issue of material fact regarding this claim because the court had previously denied the bank's motion for declaratory relief. Thus, a triable issue remained with respect to this claim.

First Church released two counterclaims that it asserted in its answer. The first counterclaim was that the bank breached a duty of good faith and fair dealing because it "pressured" First Church into accepting Tim Patrick as the private receiver under the Loan Workout Agreement. The second counterclaim was that if First Church breached the Loan Workout Agreement because it failed

---

[18] In re Woodson, 839 F.2d 610, 620 (9th Cir. 1988).

to pay the private receiver, this breach was not material and did not justify the bank terminating the Loan Workout Agreement.

At the hearing regarding the Settlement Agreement and on appeal, the Sacottes focus only on the second counterclaim: whether the bank wrongfully terminated the Loan Workout Agreement. The Sacottes identify two "hotly contested" issues related to this claim: "(1) Who was required to pay the $10,000 retainer to Mr. Patrick, and (2) Why did Mr. Patrick resign."[19] They do not expressly argue that their failure to pay this obligation was not a material breach of the Loan Workout Agreement.

During the hearing, the trial court discounted the significance of these two "hotly contested" issues regarding the Sacottes' claim. The court and the Sacottes' counsel had the following exchange:

> THE COURT: You agree that your client was supposed to pay Mr. Patrick the $10,000?
>
> MR. FINKELSTEIN [the Sacottes' counsel]: Correct.
>
> THE COURT: And he didn't.
>
> MR. FINKELSTEIN: Well, the money was supposed to come from the pledged funds which were my client's funds.
>
> THE COURT: It was his responsibility to pay the retainer and he didn't.
>
> MR. FINKELSTEIN: But there's no—
>
> THE COURT: So [the receiver] quit.
>
> MR. FINKELSTEIN: But there's no clarity on when the money was due. Mr. Sacotte never received the—

---

[19] Brief of Appellants Sacotte at 27.

> THE COURT: Does that change the fact that [Sacotte] didn't pay [the receiver]?
>
> MR. FINKELSTEIN: Well, but, Your Honor, if Mr. Patrick first raised the issue on June 27th, Mr. Sacotte said a couple of days later I'll pay you if you send an invoice. So Mr. Patrick sends an invoice on June 30. . . . So, okay, he's supposed to pay it. He has said I will pay it. Only four days go by, four business days go by. Payment isn't made and the receiver resigns—resigns.
>
> Now, again, there's the inference that the receiver may have resigned because of the lack of payment, but there's no declaration from the receiver saying that's why [he] resigned. The receiver may very well have resigned because he had this conflict of interest, that he couldn't get a waiver from East West Bank, which hasn't come up in this discussion at all but was a very significant issue.
>
> THE COURT: I don't—I am not troubled at all about the fact that the receiver wasn't paid and he quit, and it was Mr. Sacotte's responsibility to pay him and he didn't. That is not—nothing that—nothing about that troubles me. I think that's pretty clear, those facts.[20]

The trial court considered the Sacottes' argument and determined that this claim was not strong. This was entirely reasonable on this record. Further, the Sacottes do not make arguments regarding the settlement of the other claim regarding First Church's acceptance of the private receiver. In short, the trial court did not abuse its discretion when it approved the settlement of these claims.

The Sacottes make a number of arguments that the Settlement Agreement was one-sided, unfair, and inequitable. But none are persuasive.

---

[20] Report of Proceedings (Sept. 23, 2011) at 27-29.

First, the Sacottes argue that the receiver did "not disclose[] in any pleading" that the $10,000 would pay for the receiver's costs of arranging the settlement and seeking court approval. But at oral argument the receiver told the trial court just that. The receiver stated, "So we began discussions with the bank about how to resolve this claim. The bank initially wanted this claim to go away with no consideration. I asked the bank to pay for at least the cost of investigation, the cost of this motion. They agreed to pay $10,000."[21] Thus, this was disclosed to the trial court.

Second, the Sacottes assert that "[b]ecause the facts and the inferences therefrom were disputed, the record was limited, and the fact-finding process had just begun, it was error for the trial court to find that First Church's claims had no merit whatsoever."[22] There are two problems with this argument.

To begin with, the hearing to approve the settlement was not a forum for conducting a trial. The purpose of the hearing was for the trial court to determine whether the Settlement Agreement was fair and equitable. This record provided sufficient information for the trial court to make that assessment.

Additionally, the trial court did not determine that First Church's claims had no merit. Nor did it determine who would ultimately prevail on each claim. The trial court was considering the strength of the parties' claims, so it could determine whether the Settlement Agreement was fair and equitable.

---

[21] Report of Proceedings (Sept. 23, 2011) at 7.

[22] Brief of Appellants Sacotte at 27 (footnote omitted).

Third, the Sacottes contend that the Settlement Agreement was unfair and inequitable because the bank's claim regarding the improperly diverted loan funds did not have merit. They provide three reasons in support of this argument, but none of these reasons show lack of merit in the bank's claim against First Church.

The Sacottes first assert that the bank unconditionally released this claim under the Loan Workout Agreement. They are wrong.

They point to a declaration by First Church's former attorney who stated that the "'parties did not intend for the Release to be of no effect if the [Loan] Workout Agreement was breached.'"[23] But the plain words of the agreement show otherwise. The agreement stated, "As a material inducement to the Parties to enter into this Agreement, the Parties agree to the following releases . . . ."[24] We need not consider extrinsic evidence to determine the parties' intent in this case. As the bank argues, it is clear that "[t]he [b]ank's agreement to enter into a release of its claims was part of the consideration for First Church entering into the [Loan Workout Agreement]. The appellants cannot claim the benefit of the [agreement] where they breached the terms and failed to perform."[25] The trial court properly agreed with this analysis.

---

[23] Reply Brief of Appellants at Sacotte at 12 (quoting Clerk's Papers at 780).

[24] Clerk's Papers at 415.

[25] Brief of Respondent at 20.

Additionally, the Sacottes argue that they provided documentation that shows that "all amounts owed by the so-called 'Sacotte-controlled entities' had been repaid and were properly reconciled." But at the hearing, the bank asserted that First Church had not yet produced "a single document . . . [that] establish[es] that any of this diversion of funds was proper." Additionally, the trial court stated it had "some concerns" about First Church's bookkeeping.

Furthermore, the Sacottes assert that the bank would be "double-dipping if it were permitted to recover the $938,185." But the receiver explained that the bank's claim is not "double-dipping":

> The bank dispersed approximately $9.5 million to Mr. Sacotte. 8.5 of that went into the property and is a secured claim against that property. My position was that the 900 to a million dollars that he diverted to other entities was not secured against the property. It's an unsecured claim.[26]

This analysis is correct. The diversion of funds the bank advanced for the townhouses to other projects arguably made the bank's advance unsecured to the extent of the diversion from this project. Thus, there was no double-dipping by the bank to the extent of this claim.

Fourth, the Sacottes argue that the Settlement Agreement was not necessary to eliminate the risk and cost of further litigation. The Sacottes contend that they, not First Church, had "retained counsel to pursue the claims against Charter Bank and defend against the Bank's claim for diversion of funds." Thus, they assert that First Church would not incur any litigation fees. But the Sacottes do not point to anything in the record to support this assertion. In fact,

---

[26] Report of Proceedings (Sept. 23, 2011) at 22.

the Sacottes' attorney stated at the hearing that he was representing the Sacottes *and* First Church.[27] Given this statement by counsel at this hearing, the Sacottes' representation that First Church would not incur further litigation expense is simply not believable.

Fifth, the Sacottes assert that the Settlement Agreement was not necessary to facilitate the bank's sale of First Church's promissory note because the sale was completed before the approval of the Settlement Agreement. While the receiver stated in his motion that the Settlement Agreement would "facilitate the Note sale," the receiver told the trial court that the sale was no longer a consideration.[28] Thus, sale of the note became moot as of the time of the hearing.

Sixth, the Sacottes contend that the Settlement Agreement was not fair and equitable because it did not benefit non-bank creditors. They argue that "based on the expected sales prices of the townhomes, it was clear that none of the sales proceeds would go to the non-bank creditors." "Thus, the only hope of non-bank creditors to recover any funds in the receivership was for First Church to prevail on its claims against the Bank."

But for this to be so, any claim of First Church would have to have been sufficiently large to exceed the substantial claim the bank had for improper

---

[27] Id. at 2.

[28] Clerk's Papers at 528; Report of Proceedings (Sept. 23, 2011) at 9 ("There was—there was a note sale, Your Honor, that was—has now concluded. At the initial filing of this motion, I was in the process of negotiating a sale of a note of the bank to a third party.").

diversion of funds, which we already discussed. And this further assumes such claims had substantial merit.

We also note that this record does not show that any non-bank creditors other than the Sacottes appeared at the hearing to contest approval of the settlement. This is telling.

On this record, the trial court did not abuse its discretion when it approved the Settlement Agreement even if it did not benefit non-bank creditors.[29]

Finally, the Sacottes argue that the trial court erred by deferring to the receiver's assertions regarding the settlement. In their motion for reconsideration and on appeal, they contend that there was evidence that the receiver was not a neutral and disinterested party. The supreme court has explained:

> A receiver is an indifferent person between the parties to a cause, appointed by the court to receive and preserve the property or fund in litigation *pendente lite*, when it does not seem reasonable to the court that either party should hold it. [A receiver] is not the agent or representative of either party to the action, but is uniformly regarded as an officer of the court, exercising his functions in the interest of neither plaintiff nor defendant, but for the common benefit of all parties in interest.[30]

The Sacottes assert that information on the receiver company's website raised concerns about whether the receiver was a disinterested party. The website stated that the bank was one of its clients and some of the bank's employees

---

[29] See, e.g., In re A & C Props., 784 F.2d at 1382 ("[W]hile creditors' objections to a compromise must be afforded due deference, such objections are not controlling, and while the court must preserve the rights of the creditors, it must also weigh certain factors to determine whether the compromise is in the best interest of the bankrupt estate.") (citations omitted).

[30] Gloyd v. Rutherford, 62 Wn.2d 59, 60-61, 380 P.2d 867 (1963) (internal quotation marks omitted).

were listed as references. But there is no evidence that the bank was a client in this case. Rather, the trial court appointed the receiver in this case.

Moreover, the Sacottes' concerns about the receiver would have been more appropriate to raise when the trial court was considering the bank's motion to appoint a receiver. The Sacottes failed to raise this concern until more than a year after the receiver's appointment.

The Sacottes also point to bankruptcy rules, which require a prospective trustee to explain the trustee's "'connections'" with relevant parties. But the bankruptcy rules do not apply in this state court case. There was no requirement that the receiver comply with this requirement. For these reasons, the Sacottes' arguments regarding the receiver's neutrality are not well-taken.

The Sacottes do not expressly argue that the trial court's decision to approve the settlement agreement was unfair and inequitable by failing to specifically articulate the factors stated in In re A & C Properties. To the extent they implicitly make this argument, we reject it. A fair reading of the factors stated in that case and a comparison of them with the trial court's articulated reasons for approving the settlement here shows that the court was well within its discretion to approve the settlement.

In sum, the trial court did not abuse its discretion when it approved the Settlement Agreement between First Church and the bank.

The bank argues that the Sacottes lack standing to challenge the approval of the Settlement Agreement between the bank and First Church. Because we

have reached the merits and resolved the claims against the Sacottes, we need not address this issue.

## ATTORNEY FEES

The bank requests attorney fees against the Sacottes based solely on the construction loan agreement with First Church. Because the Sacottes are not parties to this agreement, we deny the request for fees.

This agreement contains the following provision:

> FEES AND EXPENSES. Whether or not the Project shall be consummated, *Borrower* shall assume and pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including without limitation the following: (A) all closing costs, loan fees, and disbursements; (B) all expenses of Lender's legal counsel; and (C) all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.[31]

First Church LLC, who is not a party to this appeal, is the only "Borrower" under this agreement. Joseph Sacotte signed the agreement solely in his capacity as manager of First Church LLC, not in his individual capacity. Thus, this provision does not apply to the Sacottes, the parties to this appeal.

We affirm the orders on appeal and deny the bank's request for attorney fees against the Sacottes.

Cox, J.

WE CONCUR:

---

[31] Clerk's Papers at 9 (emphasis added).

16